**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**
**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | District | |
|---|---|---|
| Name (under which you were convicted): | | Docket or Case No.: |
| Place of Confinement: | | Prisoner No.: |
| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) | |
| v. | | |

### MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:



    (b) Criminal docket or case number (if you know):

2.  (a) Date of the judgment of conviction (if you know):

    (b) Date of sentencing:

3.  Length of sentence:

4.  Nature of crime (all counts):

    _____

    _____

    _____

    _____

    _____

5.  (a) What was your plea? (Check one)

    (1)  Not guilty ❏          (2)  Guilty ❏          (3)  Nolo contendere (no contest) ❏

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

    _____

    _____

    _____

    _____

6.  If you went to trial, what kind of trial did you have? (Check one)     Jury ❏       Judge only ❏

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?      Yes ❑         No ❑

8.  Did you appeal from the judgment of conviction?      Yes ❑         No ❑

9.  If you did appeal, answer the following:

(a) Name of court:

(b) Docket or case number (if you know):

(c) Result:

(d) Date of result (if you know):

(e) Citation to the case (if you know):

(f) Grounds raised:

_____

_____

_____

_____

_____

_____

(g) Did you file a petition for certiorari in the United States Supreme Court?      Yes ❑    No ❑

If "Yes," answer the following:

(1) Docket or case number (if you know):

(2) Result:


(3) Date of result (if you know):

(4) Citation to the case (if you know):

(5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ❑    No ❑

11. If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?     Yes ❑  No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?     Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:      Yes ❑   No ❑

(2)  Second petition:    Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

**GROUND ONE:**

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑    No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑  No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO**:

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

       Yes ❑    No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

       Yes ❑    No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR**:

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑  No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑  No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑    No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑    No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑    No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?      Yes ❏   No ❏
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing:

(b) At arraignment and plea:

(c) At trial:

(d) At sentencing:

(e) On appeal:

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ❑ No ❑

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ❑ No ❑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ❑   No ❑

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of —
      (1) the date on which the judgment of conviction became final;
      (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
      (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
      (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

_____ (month, date, year).

Executed (signed) on _____ (date).

Executed (signed) on (date).

Signature of Movant
If the person signing is not movant, state relationship to movant and explain why movant is

Date: 11/30/2025

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,
       **Respondent,**

v.

**JAMES VELISSARIS,**
       **Movant.**

No. **1:22-cr-00105 (DLC)**

## MOTION UNDER 28 U.S.C. § 2255

### TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Movant, **James Velissaris** ("Movant"), respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his conviction and sentence in *United States v. Velissaris*, No. 1:22-cr-00105 (DLC). This motion is supported by the accompanying Declaration of James Velissaris ("Velissaris Decl.") and attached exhibits.

## I. INTRODUCTION

From 2014 to 2021, Movant served as the Chief Investment Officer of Infinity Q Capital Management LLC, overseeing the Infinity Q Diversified Alpha Fund ("DAF"), Volatility Alpha Fund ("VAF"), and Opportunistic Alpha Fund ("OAF") (collectively, the "Funds"). Velissaris Decl. ¶¶ 2, 6. He holds a bachelor's degree in Economics from Harvard and a master's degree in Operations Research from Columbia, and has spent his career conducting quantitative investment and risk analysis across a wide range of complex financial instruments. Id. ¶¶ 4–5.

The Government's theory in this case was that Movant fraudulently inflated valuations of complex, largely illiquid derivatives. Movant's consistent defense, however, has been that:

- The Funds were expressly disclosed as using **subjective judgment** to value illiquid securities that had no official market price;

- The Bloomberg valuation tools (including BVAL) used by Infinity Q were **known to be inaccurate**, especially in periods of heightened volatility; and
- Manual adjustments were required to correct Bloomberg's **coding and valuation errors**, not to perpetrate fraud.

The conviction and sentence in this case rest on constitutional and evidentiary defects that are now clearly demonstrated by records and facts summarized in the Velissaris Declaration and its exhibits. In particular:

1. The Government failed to disclose that **Bloomberg's BVAL tool was under SEC investigation and later fined $5 million for valuation errors**, despite BVAL being central to the case and Movant's defense (Brady violation). Velissaris Decl. ¶¶ 11(a)–(c), 14(a), Ex. 1.
2. The SEC alleged that Infinity Q COO **Scott Lindell** had **illegally edited documents**, yet he was permitted to continue reviewing and providing hundreds of thousands of additional documents underpinning the criminal case, tainting the evidentiary record ("fruit of the poisonous tree"). Velissaris Decl. ¶ 9(h).
3. The Government's loss and valuation expert relied on the same **flawed BVAL tool** and **manually recreated historical data**, while expressly admitting she was not calculating "true value," rendering the testimony inadmissible and unreliable under Rule 703. Velissaris Decl. ¶ 11(d)–(e), Ex. 1, Ex. 9.
4. The Court effectively conditioned Movant's ability to present a **defense expert** on Movant taking the stand himself, burdening his Fifth Amendment right not to testify and his right to present a defense.
5. Movant's lead trial counsel, **Michael Krause**, was actively being interviewed by the **CFTC**, an agency involved in this matter, during trial preparation; this conflict was not disclosed until weeks before sentencing. During this period, Krause aggressively pressured Movant to plead guilty, creating an undisclosed, actual conflict of interest and ineffective assistance of counsel. Velissaris Decl. ¶ 14(c)–(e).

Individually and cumulatively, these violations require vacatur of Movant's conviction and sentence, or, at minimum, an evidentiary hearing.

---

## II. JURISDICTION & TIMELINESS

This Court has jurisdiction under 28 U.S.C. § 2255(a) as the sentencing court.

Movant was sentenced on April 7, 2023, and his conviction became final on December 3, 2024. This motion is timely under § 2255(f). To the extent any claim is argued to be untimely, the limitations period is extended under § 2255(f)(4) because key facts—such as the SEC's BVAL enforcement action and the CFTC's pursuit of Mr. Krause—were not disclosed and could not have been discovered earlier through due diligence. Velissaris Decl. ¶¶ 11(c), 14(a)–(c).

## III. FACTUAL BACKGROUND (CONDENSED)

1. **Nature of the Funds and Valuations**
   - The Funds used **diversified strategies** including equity long/short, global macro, managed futures, and volatility trading. Most assets were liquid; roughly 15–25% were illiquid, private, over-the-counter derivatives with no official market price. Velissaris Decl. ¶ 7(a)–(b).
   - Infinity Q's **prospectuses, PPMs, valuation policies, and audited financial statements** repeatedly disclosed that illiquid securities would be valued using **subjective judgment** when pricing services were unreliable. These disclosures were made **over one thousand times** to investors. Velissaris Decl. ¶¶ 7(c), 9(a)–(b), Ex. 2.
   - Representative disclosure language stated that when a pricing service "may not provide a reliable indication of fair value, Infinity Q will value each such position" using internal models and other appropriate factors. Id.
2. **Bloomberg Tools and Transparency**
   - Infinity Q used multiple valuation tools, including **Bloomberg's derivatives library and BVAL**. These were chosen in part because they allowed **daily, full transparency**: Infinity Q staff, the administrator (U.S. Bank), and the auditor (EisnerAmper) could review all valuation changes and historical changes for every security over the Relevant Period. Velissaris Decl. ¶¶ 7(d), 9(f)–(g).
   - Between 15 and 20 external users had direct access to the Bloomberg system to monitor valuations. Id.
3. **Systemic Errors in Bloomberg and Manual Adjustments**
   - Bloomberg's tools worked adequately in calm markets but were **extremely inaccurate** during medium and high volatility. Infinity Q first observed issues in Q4 2018, and they became severe during the COVID-19 crisis when the VIX reached **89**, an all-time high. Velissaris Decl. ¶ 11(a); see also ¶ 7(e).
   - The errors systematically **overvalued short volatility** positions and **undervalued long volatility** positions. Id.
   - Defense derivatives expert **Dr. Atanu Saha** identified a **coding error** in the Bloomberg tools that caused these systemic mis-valuations. Because Infinity Q held roughly **five times as many long volatility positions as short**, more manual updates were required on the long side to correct the under-valuations created by Bloomberg's error. Velissaris Decl. ¶¶ 6(f), 11(b), Ex. 1.
4. **Regulatory Action Against BVAL**
   - In **January 2023**, the SEC fined Bloomberg's BVAL tool **$5 million** for valuation errors across the platform. Velissaris Decl. ¶ 11(c).
   - The DOJ, SEC, and CFTC were aware of flaws in the Bloomberg tool used in this case, yet **no one disclosed this to Movant** before his plea hearing, despite his repeated defense that Bloomberg's tool was broken and required manual adjustments. Velissaris Decl. ¶ 14(a).
   - The Government made public statements acknowledging Bloomberg's flaws **only after** Movant's plea.
5. **Role of Lindell and Document Production**

- o Infinity Q's COO, **Scott Lindell**, reviewed and approved all valuations and **directed hundreds of valuation updates** to be made in the Bloomberg system. Velissaris Decl. ¶ 9(h).
- o The SEC later alleged that Lindell **illegally edited documents** before providing them. Nevertheless, he was allowed to continue reviewing and providing vast quantities of documents that formed the backbone of the SEC and DOJ cases.

6. **Loss, Materiality, and Liquidation**
- o The Government's case rested on an alleged **2.4% valuation difference** between roughly **$2.90 billion and $2.83 billion**—well within the 5% quantitative materiality threshold in SEC Staff Accounting Bulletin 99 (SAB 99). Velissaris Decl. ¶¶ 12(a), 12(c), Ex. 2.
- o The securities at issue were **custom, illiquid Level 3 derivatives** with trading volumes declining by ~95% in 2020, making precise pricing inherently difficult. Velissaris Decl. ¶ 12(b), Ex. 6.
- o Infinity Q developed an **11-month plan** to exit these positions, communicated to the SEC and U.S. Bank. Two weeks later, U.S. Bank unilaterally liquidated the DAF in **six days**, over Movant's objections that this "fire sale" would harm investors. Velissaris Decl. ¶ 13(d)–(h), Ex. 4, Ex. 6. Movant had already sold ~15% of such positions at a net gain earlier in 2021. Id.

7. **Counsel Conflict and CFTC Involvement**
- o During the lead-up to trial, the CFTC began **pursuing and interviewing Movant's lead criminal defense counsel, Michael Krause**, in connection with potential employment. Velissaris Decl. ¶ 14(c).
- o Krause **repeatedly pressured and even yelled at Movant** to accept a plea agreement just days before trial. Velissaris Decl. ¶ 14(d).
- o Movant was not told about the CFTC's pursuit of Krause until **weeks before sentencing**, long after critical strategic decisions had been made. Id. ¶ 14(c)–(e).

These facts directly support the legal grounds for relief below.

---

# IV. GROUNDS FOR RELIEF

## GROUND ONE

**Brady Violation – Nondisclosure of SEC Investigation and Enforcement Against Bloomberg's BVAL System**

The Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Bloomberg's BVAL tool—the very pricing service at the heart of this case—was under SEC investigation and was later fined $5 million for valuation errors.

1. **Favorable, Exculpatory, and Impeachment Evidence**

- o Movant's core defense has always been that Bloomberg's valuation tools were **broken**, particularly during high volatility, and that manual adjustments were necessary to achieve fair value. Velissaris Decl. ¶¶ 7(e), 11(a)–(b), 14(a).
- o In January 2023, the SEC imposed a **$5 million fine** on BVAL for valuation errors. Velissaris Decl. ¶ 11(c).
- o The Government later publicly acknowledged that Bloomberg's tool was flawed, but this acknowledgment came **only after** Movant's plea hearing. Velissaris Decl. ¶ 14(a).

This information is plainly **exculpatory and impeaching**: it corroborates the defense theory that valuation discrepancies could stem from systemic Bloomberg errors, undermines the Government's portrayal of BVAL as reliable, and impeaches witnesses who relied on or vouched for BVAL.

2. **Suppression by the Government**
   - o The SEC and CFTC worked closely with the DOJ in this matter. BVAL's flaws and the SEC's enforcement action were within the knowledge of the Government's investigative "team."
   - o Despite Movant repeatedly arguing that **BVAL was faulty** as the reason for manual adjustments, no one disclosed that regulators had themselves found BVAL to be materially flawed. Velissaris Decl. ¶ 14(a).
3. **Materiality**
   - o The case turned on whether valuation differences reflected intentional fraud or the operation of a flawed pricing tool in volatile markets. Evidence that regulators themselves fined BVAL for valuation errors is **material** to that question.
   - o Had this information been disclosed, Movant could have cross-examined the Government's expert and other witnesses about BVAL's unreliability, called his own expert (Dr. Saha) with this regulatory backdrop, and argued powerfully that manual adjustments were corrective rather than fraudulent.

There is at least a reasonable probability that disclosure of the SEC's BVAL investigation and enforcement action would have changed the outcome of the plea decision, evidentiary hearing, and/or sentencing. The suppression constitutes a *Brady* violation requiring relief.

---

## GROUND TWO

**Tainted Evidence from SEC Investigation – "Fruit of the Poisonous Tree" and Due Process**

The Government's case relied heavily on documents and data originating from the SEC's Infinity Q investigation in which **COO Scott Lindell** was alleged to have **illegally edited documents** before production.

- Lindell approved all valuations and "directed hundreds of valuation updates" in the Bloomberg system. Velissaris Decl. ¶ 9(h).

- Despite SEC allegations of document tampering, Lindell was allowed to continue reviewing and producing **hundreds of thousands of documents** that became the foundation of the criminal case.

Due process is violated when the Government knowingly relies on evidence that may be **manipulated or falsified** and fails to disclose or correct that risk. Here, the SEC's own allegations about Lindell's conduct cast doubt on the authenticity and integrity of the documentary record.

Had the taint been fully disclosed, Movant could have:

- Sought suppression or an evidentiary hearing regarding the reliability of documentary evidence;
- Engaged forensic analysis of metadata and document histories; and
- Presented the jury (or the Court) with grounds to doubt the completeness and accuracy of the Government's exhibits.

Given Lindell's central role in valuations and document production, this taint infects much of the evidence against Movant and undermines confidence in the result.

---

## GROUND THREE

**Improper Expert Testimony Under Rule 703 and Use of Flawed Bloomberg Data – Due Process Violation**

Federal Rule of Evidence 703 requires that an expert's opinion rest on data reasonably relied upon by experts in the field. In this case, the Government's expert valuations were based on:

1. Bloomberg's **BVAL and related tools**, which were known to be inaccurate and later sanctioned by the SEC; and
2. **Manually recreated historical data**, constructed after the fact because Bloomberg could not provide accurate historical valuations.
3. **Unreliable Bloomberg Inputs**
    - The Bloomberg tools performed poorly during volatility spikes; Infinity Q observed this in Q4 2018 and acutely during the COVID-19 crisis when the VIX reached 89. Velissaris Decl. ¶ 11(a).
    - These tools systematically overvalued short volatility and undervalued long volatility positions. Id.
    - Dr. Saha's expert report identified a **coding error** in Bloomberg's system that created these systemic distortions. Velissaris Decl. ¶¶ 6(f), 11(b), Ex. 1.
4. **Manual Reconstruction and Government Admissions**
    - Bloomberg was unable to provide reliable historical data, forcing the Government's expert to rely on **manually recreated historical valuations**, layered on top of a flawed tool.

- At the November 18, 2022 evidentiary hearing, the Government admitted that its expert **"is not trying to calculate true value."** Velissaris Decl. ¶ 11(d), Ex. 9.
- The Court nonetheless stated that "whether BVAL is a reliable tool is largely immaterial." Velissaris Decl. ¶ 11(e), Ex. 9.

It is not reasonable for an expert to base loss and restitution calculations on (1) a tool later fined by the SEC for valuation errors, and (2) ad hoc reconstructed data, while conceding that the exercise does **not** attempt to measure true fair value of custom, illiquid Level 3 derivatives.

3. **Materiality and Prejudice**
   - The Government's own figures suggest an alleged valuation difference of only **2.4%** between approximately **$2.90 billion and $2.83 billion**. Velissaris Decl. ¶¶ 12(a), 12(c), Ex. 2.
   - SEC SAB 99 generally treats discrepancies of less than 5% as **quantitatively immaterial**, especially where qualitative factors do not override. Id.
   - The instruments at issue were illiquid, bespoke derivatives with a 95% collapse in trading volume in 2020, inherently subject to significant valuation band-width. Velissaris Decl. ¶ 12(b), Ex. 6.

Thus, the Government's expert testimony was not just weak; it was built on **structurally unreliable data** and yielded a difference that is immaterial under prevailing standards. Admitting and relying on such testimony to drive the loss calculation and restitution violated Rule 703 and deprived Movant of a fair, reliable proceeding.

---

## GROUND FOUR

**Fifth Amendment Violation – Conditioning Defense Expert Testimony on Movant's Testimony**

The Court effectively conditioned Movant's ability to present a **defense expert witness on valuation** on Movant himself taking the stand. This ruling forced Movant to choose between:

- Exercising his **Fifth Amendment right** not to testify; and
- Presenting critical expert testimony on the flaws in Bloomberg's tools, the subjective nature of Level 3 valuation, and the reasonableness of Infinity Q's manual adjustments.

Under *Brooks v. Tennessee*, 406 U.S. 605 (1972), and related cases, courts may not impose conditions that penalize a defendant for exercising the right to remain silent or unduly burden the right to present a defense.

Given the centrality of complex derivatives valuation to the case—and the existence of a detailed expert report by Dr. Saha filed in the District Court record (Velissaris Decl. ¶ 8(a), Ex. 1)—preventing the jury from hearing defense expert testimony unless Movant testified himself distorted the truth-finding process and violated his Fifth and Sixth Amendment rights.

There is a reasonable probability that, had a defense expert been allowed to testify independent of Movant's decision to testify, the factfinder would have viewed both the Government's expert and the alleged valuation "inflation" very differently.

---

## GROUND FIVE

**Ineffective Assistance of Counsel – Undisclosed CFTC Conflict and Coercive Plea Pressure**

Movant's lead counsel, **Michael Krause**, labored under a serious, undisclosed conflict of interest during critical stages of the case, violating the Sixth Amendment.

1. **Actual Conflict of Interest**
   o While preparing for Movant's criminal trial, the CFTC—one of the regulators involved in the Infinity Q matter—was **pursuing and interviewing Krause for potential employment**. Velissaris Decl. ¶ 14(c).
   o Krause's personal interest in securing a job with the CFTC conflicted with his duty to zealously defend Movant, including by challenging CFTC/SEC conduct, Bloomberg's role, and the regulatory narrative. Id. ¶ 14(c)–(e).
2. **Failure to Disclose and Coercive Plea Pressure**
   o Krause **did not disclose** this conflict to Movant during the lead-up to trial or prior to Movant's plea decision; Movant learned of it only **weeks before sentencing**, long after key strategic decisions had been made. Velissaris Decl. ¶ 14(c).
   o During this period, Krause **"repeatedly pressured"** Movant to take a plea, at times yelling and intimidating him. Velissaris Decl. ¶ 14(d).
   o The CFTC's active pursuit of Krause "created a substantial conflict of interest," in Movant's words, and undermined his trust in counsel's plea advice. Velissaris Decl. ¶ 14(e).
3. **Adverse Effect and Prejudice**

   Under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), an undisclosed, actual conflict that adversely affects counsel's performance violates the Sixth Amendment. Here, the conflict likely:

   o Discouraged counsel from aggressively attacking the SEC/CFTC roles, the BVAL flaws, and the regulator-driven liquidation decisions;
   o Skewed counsel's advice toward a quick plea resolution that could be viewed favorably by CFTC; and
   o Denied Movant the opportunity to seek conflict-free counsel before deciding whether to go to trial, to withdraw his plea, or to challenge the Government's valuation and loss theories.

Even under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel's failure to disclose his conflict, combined with coercive plea pressure and the lack of informed consent, falls below an objective standard of reasonableness and prejudiced Movant. Conflict-free counsel could have

advised differently about trial, plea, and post-plea litigation (including motions to withdraw the plea based on BVAL and other issues). Velissaris Decl. ¶ 14(b)–(e), Ex. 2, Ex. 9.

## CUMULATIVE ERROR

Even if any single error were deemed insufficient, the **combined effect** of:

- The *Brady* violation concerning BVAL,
- The tainted documentary record tied to Lindell,
- The unreliable expert testimony based on flawed BVAL data and reconstructed prices,
- The Fifth Amendment violation restricting defense expert testimony, and
- The CFTC-driven conflict of interest affecting counsel's advice,

deprived Movant of a fair proceeding. The cumulative errors warrant relief under § 2255.

## V. REQUEST FOR EVIDENTIARY HEARING

Under 28 U.S.C. § 2255(b), Movant is entitled to an evidentiary hearing unless the record conclusively shows he is entitled to no relief. Movant respectfully requests a hearing to develop the record on, among other things:

- The SEC's investigation and enforcement action against BVAL, and when the Government knew of BVAL's flaws;
- The nature and extent of Lindell's document alterations and his role in document production;
- The precise data and methods used by the Government's expert, including reliance on BVAL and reconstructed data;
- The CFTC's communications with and pursuit of Michael Krause, and the effect on his representation of Movant; and
- The Court's earlier rulings regarding defense expert testimony and the conditioning of such testimony on Movant's decision to testify.

## VI. RELIEF REQUESTED

Movant respectfully requests that the Court:

1. **Vacate his conviction and sentence;**
2. **Grant a new trial;** or, at minimum,
3. **Order an evidentiary hearing** on the claims raised;

4. Appoint counsel to represent Movant in these § 2255 proceedings; and

5. Grant any further relief the Court deems just and proper.

## VII. DECLARATION UNDER 28 U.S.C. § 1746

I, **James Velissaris** declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: November 30, 2025
Location: Jesup FPC, Jesup , Geirgia

**James Velissaris**
Reg. No. 86813-509
Jesup Federal Prison Camp



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
DANIEL PATRICK MOYNIHAN COURTHOUSE
500 PEARL STREET
NEW YORK, NEW YORK 10007

PRO SE OFFICE                                                          RUBY J. KRAJICK
Room 230                                                              Clerk of Court

### Instructions for Filing
### Motion under 28 U.S.C. § 2255

1. **Who should use this form:** You may use this form if you are in custody (such as in prison or subject to supervised release) based on a federal court conviction and you are asking for relief from the conviction or sentence.  You must file the motion in the federal district court that entered the judgment that you are challenging and include all grounds for relief.  State the facts that support each ground.  If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds later.

2. **Who should *not* use this form:** Do not use this form if you want to challenge the validity of a state court judgment of conviction and sentence.  To challenge a state court judgment, you must first exhaust your state court remedies in the state appellate process and then file a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254 in the federal district court where your state judgment of conviction was entered.  If you are in federal custody or subject to a custodial order of the United States and wish to challenge the execution – not the validity – of your federal conviction or sentence (such as, for example, that the BOP miscalculated a sentence or failed to award good time credits properly), you should file a petition for a writ of *habeas corpus* under 28 U.S.C. § 2241 (For Prisoners) in the federal district court where you are confined.  If you want to challenge your immigration detention, you may use the form Petition for a Writ of *Habeas Corpus* under 28 U.S.C. § 2241 (For Immigration Matters).

3. **Caption:**  The caption is located in the top left corner on the first page of the petition.  You, as the person filing the petition, are the "petitioner."  Generally, the Warden or Superintendent of the institution in which you are confined is the "respondent."  The respondent may also be the government official responsible for your confinement.

4. **Signature:** The petition must be signed with a pen.

5. **Fee:** There is no filing fee for a motion brought under 28 U.S.C. § 2255.