**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES VELISSARIS,

          Petitioner,

v.

UNITED STATES OF AMERICA,

          Respondent.

25 Cv. 10059 (DLC),
22 Cr. 105 (DLC)

**MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO**
**DEFENDANT'S SECTION 2255 PETITION**

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Leslie Arffa
Assistant United States Attorney
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND ........................................................................................................................... 4

    A.  THE OFFENSE CONDUCT ..................................................................................... 4

    B.  THE INDICTMENT AND PETITIONER'S GUILTY PLEA........................................... 5

    C.  THE MOTION TO WITHDRAW, SENTENCING, AND APPEAL ................................ 6

APPLICABLE LAW ..................................................................................................................... 8

    I.  PETITIONS UNDER SECTION 2255........................................................................ 8

    II.  PROCEDURAL DEFAULT........................................................................................ 9

ARGUMENT................................................................................................................................ 11

    I.  PETITIONER'S DEFAULTED *BRADY* CLAIM FAILS ................................................ 11

    II.  PETITIONER'S DEFAULTED DUE PROCESS CLAIM FAILS.................................. 14

    III. PETITIONER'S COLLATERAL ATTACK ON HIS SENTENCE AND
        RESTITUTION FAILS ........................................................................................ 15

    IV. PETITIONER'S DEFAULTED CHALLENGE TO THE COURT'S PRE-TRIAL
        EVIDENTIARY DETERMINATION FAILS ................................................................ 18

    V.  PETITIONER'S DEFAULTED INEFFECTIVE ASSISTANCE CLAIM FAILS.......... 20

CONCLUSION .......................................................................................................................... 22

## TABLE OF AUTHORITIES

*Amato v. United States*,
   763 F. App'x 21 (2d Cir. 2019) ................................................................................ 21

*Barnett v. United States*,
   870 F. Supp. 1197 (S.D.N.Y. 1994) ........................................................................ 14

*Bousley v. United States*,
   523 U.S. 614 (1998) ............................................................................... 9, 10, 11

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................. 1, 5, 11

*Campino v. United States*,
   968 F.2d 187, 190 (2d Cir. 1992) ............................................................................ 20

*Collins v. Scully*,
   755 F.2d 16, 18 (2d Cir. 1985) ............................................................................... 17

*Davis v. United States*,
   2022 WL 445846 (S.D.N.Y. Feb. 14, 2022) ........................................................... 15

*DiSimone v. Phillips*,
   461 F.3d 181 (2d Cir. 2006) .................................................................................... 10

*Gutierrez v. Smith*,
   702 F.3d 103 (2d Cir. 2012) .................................................................................... 11

*Hill v. United States*,
   368 U.S. 424 (1962) ................................................................................................... 9

*Kaminski v. United States*,
   339 F.3d 84 (2d Cir. 2003) ...................................................................................... 16

*McCleskey v. Zant*,
   499 U.S. 467, 490-91 (1991) ....................................................................... 9, 10, 12

*Melo v. United States*,
   2008 WL 5431170 (S.D.N.Y. Dec. 22, 2008) .......................................................... 9

*Rodriguez v. Fischer*,
   2002 WL 1492118 (S.D.N.Y. July 11, 2002) .......................................................... 22

*United States v. Rutigliano*,
   887 F.3d 98, 101 (2d Cir. 2018) ........................................................................ 2, 16

*Silverman v. United States*,
556 F.2d 655 (2d Cir. 1977) .......................................................................... 14

*Strickland v. Washington*,
466 U.S. 668 (1984)...................................................................................... 21

*Strickler v. Greene*,
527 U.S. 263 (1999)...................................................................................... 10

*Triana v. United States*,
205 F.3d 36 (2d Cir. 2000) ............................................................................ 21

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998) .......................................................................... 12

*United States v. Bartels*,
175 F.3d 1008 (2d Cir. 1999) ..................................................................... 3, 18

*United States v. Bokun*,
73 F.3d 8 (2d Cir. 1995) .................................................................................. 9

*United States v. Contreras*,
110 F. App'x 153 (2d Cir. 2004)..................................................................... 18

*United States v. Frady*,
456 U.S. 152 (1982)......................................................................................... 9

*United States v. Polanco*,
2025 WL 562590 (S.D.N.Y. Feb. 20, 2025)............................................. 8, 9, 10

*United States v. Rosemond*,
958 F.3d 111 (2d Cir. 2020) .......................................................................... 21

*United States v. Thorn*,
659 F.3d 227 (2d Cir. 2011).................................................................... 10, 11

*United States v. Velissaris*,
2022 WL 2392360 (S.D.N.Y. July 3, 2022) ............................................ 2, 13, 15

*United States v. Velissaris*,
2023 WL 2875487 (S.D.N.Y. Apr. 10, 2023) ............................................ *passim*

*United States v. Velissaris*,
2024 WL 4502001 (2d Cir. Oct. 16, 2024)................................................ *passim*

*United States v. Ward*,
85 F. App'x 246 (2d Cir. 2004) ...................................................................... 21

*Williams v. United States*,
   2022 WL 903001 (S.D.N.Y. Mar. 28, 2022) ............................................................................. 2

*Yick Man Mui v. United States*,
   614 F.3d 50 (2d Cir. 2010) ...................................................................................... 9. 10

*Zhang v. United States*,
   506 F.3d 162 (2d Cir. 2007) .......................................................................................... 10

The Government respectfully submits this Memorandum of Law in opposition to defendant and here Petitioner James Velissaris's motion to vacate, set aside or correct his sentence pursuant to Title 28, United States Code, Section 2255 (the "Petition").  Dkt. 149.[1]

## PRELIMINARY STATEMENT

In November 2022, Petitioner James Velissaris pled guilty to one count of securities fraud in violation of 15 U.S.C. §§ 78(j)(b), and on April 7, 2023 the Court sentenced him to 180 months' imprisonment.  Petitioner's guilty plea and sentence stemmed from a multi-year fraud he perpetrated while at Infinity Q Capital Management LLC ("Infinity Q"), an investment advisor that ran both a mutual fund and a hedge fund ("the Investment Funds"), for which Petitioner served as Chief Investment Officer and majority owner.  Petitioner represented to Infinity Q's investors that the Investment Funds' holdings—over-the-counter derivative positions—would be independently valued based on Bloomberg Valuations Service ("BVAL").  Instead, Petitioner defrauded investors by manipulating BVAL's system, including by making false entries into it, and thereby causing BVAL to report values that were artificially inflated.  When Petitioner's scheme was uncovered, Infinity Q liquidated its derivative positions at a substantial loss to its investors.  Petitioner now seeks to vacate his conviction and sentence under 28 U.S.C. § 2255 on multiple grounds, most of which he has procedurally defaulted and all of which are meritless.

*First*, Petitioner argues that his conviction should be vacated because the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the existence of an SEC investigation into an aspect of Bloomberg's BVAL system that resulted in a 2023 settlement.  Petition at 17.  Petitioner procedurally defaulted this claim because he "had the

---

[1] All "Dkt." references are to the docket in the criminal proceeding, 22 Cr. 105.

opportunity to [raise it] on direct appeal and failed to do so." *Williams v. United States*, 2022 WL 903001, at *7 (S.D.N.Y. Mar. 28, 2022) (quoting *United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998)).  Even if the Court could reach the merits of this claim, it fails because as this Court has already found, knowledge of the SEC's investigation into Bloomberg cannot be imputed to the DOJ prosecution team and regardless the investigation and resulting settlement were not exculpatory.  *United States v. Velissaris*, 2023 WL 2875487, at *12 (S.D.N.Y. Apr. 10, 2023), *aff'd*, 2024 WL 4502001 (2d Cir. Oct. 16, 2024) ("Velissaris's *Brady* argument about the SEC settlement is riddled with problems.").

*Second*, Petitioner appears to allege a due process violation based on the Government's supposed reliance on "illegally edited documents" provided to the SEC as part of its case.  Petition at 18-19.  Petitioner again asserts as a ground for habeas relief an issue he did not raise on direct appeal, and he does not even gesture at establishing cause or prejudice.  Even if the Court could reach the merits, Petitioner's speculative claim has no basis in reality and certainly does not call into question the knowing and voluntary nature of his guilty plea.  Petitioner does not explain which documents were supposedly edited or in what way that editing rendered the documents false.  Moreover, as the Government has previously informed the Court, its case relied "primarily on records it obtained and analysis it performed itself," not evidence from the SEC.  *United States v. Velissaris*, 2022 WL 2392360, at *3 (S.D.N.Y. July 3, 2022).

*Third*, Petitioner challenges the Court's admission of expert testimony related to the Government's calculation of loss amount and restitution because the Government relied on BVAL as part of making those calculations.  Petitioner waived the right to challenge his sentence as part of his plea, and restitution cannot be challenged on collateral review.  *United States v. Rutigliano*, 887 F.3d 98, 101 (2d Cir. 2018).  On the merits, the Second Circuit properly rejected Petitioner's

challenge to his restitution based on the same attack on the BVAL methodology that Petitioner again raises here. *Velissaris*, 2024 WL 4502001, at *3 (2d Cir. Oct. 16, 2024).

*Fourth*, Petitioner asserts that the Court violated his Fifth Amendment rights because it "conditioned" his ability to present expert testimony on his taking the stand at trial. Petitioner cannot on habeas review, and for the first time no less, challenge a pre-trial evidentiary decision in a case in which he pled guilty before trial. *United States v. Bartels*, 175 F.3d 1008, 1008 (2d Cir. 1999) (defendant's claim of error in district court's pretrial rulings in case in which he pled guilty was not reviewable). Regardless, Petitioner offers no basis to conclude that the Court offered him this Hobbesian choice and indeed the Court did no such thing.

*Fifth*, and finally, Petitioner asserts that he received constitutionally ineffective assistance of counsel because one of his attorneys was applying for a role at the Commodity Futures Trading Commission (CFTC) while also allegedly coercing him into accepting a plea. Petitioner waived this claim by failing to raise it on direct appeal despite apparently learning of the "conflict" "weeks before sentencing." Petition at 21. In any event, Petitioner cannot show the existence of a conflict or any resulting prejudice from the supposed conflict. Indeed, the Court has already concluded in a lengthy and thoughtful opinion that Petitioner's plea was "knowing and voluntary" and that there was "no indication from this record that defense counsel was pressuring Velissaris to plead guilty." *Velissaris*, 2023 WL 2875487, at *14.

At bottom, Petitioner engaged in a sophisticated, multi-year fraud. In the face of overwhelming evidence, Petitioner made the rational decision to plead guilty. Notwithstanding his buyer's remorse, the Petition offers no reason to disturb the guilty plea and resulting sentence.

3

## BACKGROUND

### A.  The Offense Conduct

Petitioner was the Chief Investment Officer and majority owner of Infinity Q, an investment advisement company headquartered in New York, New York. PSR ¶¶ 13-46.  By February 2021, Infinity Q purported to manage approximately $3 billion in assets, including the Investment Funds.  PSR ¶¶ 13-14.  Infinity Q charged management fees from the Investment Funds based on the amount of assets under management and also received performance-based fees from the hedge fund.  PSR ¶ 15.  As the majority owner of Infinity Q, Petitioner earned tens of millions of dollars from these management and performance fees.  PSR ¶ 15.

From 2018 to 2021, Petitioner made false and misleading statements to investors and others concerning Infinity Q's process for valuing certain over-the-counter derivative securities that made up a substantial portion of the holdings of the Investment Funds.  Notably, Petitioner adjusted the valuations generated by the supposedly independent tool, BVAL, which Infinity Q told investors it was using to value certain positions.  PSR ¶¶ 21-36.  For example, Petitioner entered false information about the terms of the Investment Funds' derivative positions into the BVAL models, which negated the purported independence of the BVAL and the accuracy of its valuations. PSR ¶ 28.  In other words, Petitioner manipulated BVAL to inflate the value of the Investment Funds as reported to investors, to attract and retain capital in the Investment Funds, and to increase his own compensation. PSR ¶ 16.  By inflating the apparent success of Infinity Q, Petitioner was able to attract substantial inflows to the Investment Funds, particularly as the market grew volatile and other funds' performances suffered.  PSR ¶ 35.

In 2020, the SEC began investigating the valuation practices at Infinity Q.  PSR ¶ 40.  In February 2021, after the manipulations by Petitioner were uncovered, Infinity Q liquidated the

4

Investment Funds and sold its derivative positions. These positions were sold for hundreds of millions of dollars less than the purported market value that the Investment Funds had been reporting to investors, and investors in the Investment Funds sustained substantial losses as a result. PSR ¶ 36.

## B. The Indictment and Petitioner's Guilty Plea

On February 16, 2022, a grand jury sitting in this District returned a six-count indictment charging Petitioner with securities fraud, investment adviser fraud, and wire fraud, among other offenses. Dkt. 1. On November 21, 2022, one week before trial was scheduled to begin, Petitioner signed a written plea agreement with the Government (the "Plea Agreement"). In the Plea Agreement, Petitioner agreed to plead guilty to Count One of the Indictment, charging him with committing securities fraud from 2018 through 2021. Plea Agreement at 2. The parties stipulated in the Plea Agreement that the loss resulting from the fraud exceeded $65 million, but was less than $150 million, and that the recommended sentence under the United States Sentencing Guidelines (the "Guidelines") was 235 to 240 months' imprisonment. *Id.* at 3. Petitioner agreed not to appeal any sentence within or below that range. *Id.* at 4.

In the written Plea Agreement Petitioner "acknowledge[d] that he ha[d] accepted this Agreement and decided to plead guilty because he [wa]s in fact guilty." *Id.* at 5. Petitioner also "waive[d] any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement." *Id.* at 5.

On November 21, 2022, Petitioner appeared before the Court and pleaded guilty to Count One of the Indictment.  Prior to accepting the guilty plea, the Court placed Petitioner under oath and conducted a thorough allocution under Federal Rule of Criminal Procedure 11.  Among other things, Petitioner confirmed that he had had a sufficient opportunity to discuss his case, the nature of the charge in Count One, and "the consequences . . . of entering a guilty plea" with his counsel, and that he was satisfied with his counsel's representation.  Dkt. 72 (Hearing Tr.) at 5.  Petitioner also confirmed that he had "given up" his "right to appeal or challenge or litigate [his] sentence so long as" the Court did not sentence him above the stipulated Guidelines range of 235 to 240 months' imprisonment under the Plea Agreement.  *Id.* at 12.

During his plea colloquy, Petitioner explained his guilt as follows:

I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported.  I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place.  Some of the communications with investors occurred over the phone and by email in the Southern District of New York.  I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

*Id.* at 13-14.  The Court accepted the guilty plea, finding that it had been entered knowingly and voluntarily, that Petitioner had acknowledged that he was in fact guilty as charged in Count One, and that Petitioner was "aware of the consequences of [his] plea, including the sentence that may be imposed." *Id.* at 14.

## C.  The Motion to Withdraw, Sentencing, and Appeal

On March 24, 2023, Petitioner filed a motion to withdraw his plea.  Dkt. 94.  On April 7, 2023, the Court orally denied the motion at sentencing and confirmed that decision in a subsequently-issued 58-page opinion.  *Velissaris*, 2023 WL 2875487.  In doing so, the Court

rejected Petitioner's argument that the Government had violated its obligations under *Brady* by failing to disclose that the SEC had settled a separate investigation into Bloomberg regarding BVAL. As the Court explained in its written opinion, the SEC's settlement with Bloomberg did not concern BVAL's "accuracy" and in any event purported inaccuracies with BVAL would not have been exculpatory, since it was Petitioner who chose to represent to investors that he would rely on BVAL and then manipulated that system. *Velissaris*, 2023 WL 2875487, at *12. The Court also rejected Petitioner's argument that his plea had been involuntary in part because he had been pressured into pleading guilty by counsel. As the Court explained, there was "no indication from this record that defense counsel was pressuring [Petitioner] to plead guilty," and entering into the plea was "perfectly rational." *Id.*, at *14.

After orally denying the motion to withdraw on April 7, 2023, the Court also proceeded to sentencing. The Court found that, given Petitioner's motion to withdraw his plea and his assertion of factual innocence, "it would be entirely appropriate" to remove Petitioner's credit for acceptance of responsibility accorded him in the Plea Agreement. Dkt. 108 (Sent. Tr.) at 44. The Court ultimately sentenced Petitioner to 180 months' imprisonment, to be followed by three years' supervised release, and imposed forfeiture of $22 million, restitution to be determined at a later date, a fine of $50,000, and a $100 mandatory special assessment. Sent. Tr. 56-57. In the weeks that followed the sentencing, the parties submitted further briefing on the appropriate restitution amounts. Dkt. 127, 129, 130. The Court issued two written opinions on July 24 and August 3, Dkt. 139, 143, and on August 3 issued an amended judgment with a final restitution amount of $125,969,962.78, Dkt. 144.

Finally, on August 16, 2023, Petitioner filed a notice of appeal of his sentence and conviction. Dkt. 146. On appeal, Petitioner argued that the Court had abused its discretion in

denying his motion to withdraw his guilty plea because he was in fact innocent. Petitioner also argued that the Court had abused its discretion in calculating restitution and clearly erred in making its loss calculation because it had used BVAL as part of making those calculations. The Second Circuit rejected all of those arguments. First, the court of appeals found "no merit" to Petitioner's legal innocence theory. *Velissaris*, 2024 WL 4502001, at *3. Second, the court of appeals held that Petitioner had waived any right to appeal his sentence—and thus the loss amount underlying his Guidelines calculation—by pleading guilty. *Id.* Finally, as to restitution, the court of appeals held that the "district court did not err, let alone clearly so, in finding that the loss from Velissaris's fraud was nearly $126 million." *Id.*, at *4. After all, BVAL played a role in only a portion of the restitution calculation, and "revaluing Infinity Q's securities as investors had expected—that is, using BVAL without Velissaris's alterations—was a reasonable, albeit imperfect, method of approximating the losses caused by the defendant's fraud." *Id.* at *4.

On December 10, 2024, Petitioner's judgment became final. On December 2, 2025, Petitioner timely filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, Dkt. 149, and the Court directed the Government to file a response.

## Applicable Law

### I.     Petitions Under Section 2255

"Section 2255 permits a prisoner in custody to move to vacate, set aside, or correct his sentence on the grounds that it 'was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." *United States v. Polanco*, 2025 WL 562590, at *2 (S.D.N.Y. Feb. 20, 2025) (quoting 28 U.S.C. § 2255(a)). "To secure relief under § 2255, the petitioner must demonstrate 'a constitutional error,

a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000)); *see also Hill v. United States*, 368 U.S. 424, 428 (1962); *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995).

"Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation omitted). "The reasons for narrowly limiting the relief permitted under § 2255[—] a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place[—]are 'well known and basic to our adversary system of justice.'" *Bokun*, 73 F.3d at 12 (quoting *United States v. Addonizio*, 42 U.S. 178, 184 n.11 (1979)).

"The petitioner bears the burden of proof to establish a constitutional violation in a habeas corpus proceeding." *Melo v. United States*, 2008 WL 5431170, at * 3 (S.D.N.Y. Dec. 22, 2008) (citing *Zappulla v. New York*, 391 F.3d 462, 489 n.19 (2d Cir. 2004)).

## II.    Procedural Default

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal quotations omitted); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."). This bedrock principle arises from concerns of finality in criminal judgments. *See McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991) ("Without finality, the criminal law is deprived of much of its deterrent effect. And when a habeas petitioner succeeds in obtaining a new trial, the erosion of memory and dispersion of witnesses

9

that occur with the passage of time prejudice the government and diminish the chances of a reliable criminal adjudication.") (internal quotations and citations omitted).

In accordance with this interest in finality, a court may not consider on a Section 2255 motion a claim that could have been raised, but was not raised, on direct review because it has been "procedurally defaulted." *Bousley*, 523 U.S. at 622. "In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011); *see also Yick Man Mui*, 614 F.3d at 53-54; *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007); *Polanco*, 2025 WL 562590, at *2 ("In general, a § 2255 motion is not a substitute for a direct appeal."). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *Thorn*, 659 F.3d at 231; *accord Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (per curiam) (internal citations omitted).

The "cause" requirement means that a defendant "was impeded by some objective factor external to the defense, such as governmental interference or the reasonable unavailability of the factual basis for the claim." *McCleskey*, 499 U.S. at 468; *see also Gupta*, 913 F.3d at 84. If the defendant attempts to show cause by arguing that his claim was not legally possible at the time of conviction, the claim must be "so novel that its legal basis is not reasonably available to counsel." *Bousley*, 523 U.S. at 622 (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)); *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (a change in law may constitute cause if there is "a showing that the factual or legal basis for a claim was not reasonably available to counsel" at the time). Alternatively, the cause requirement can be met by a showing of futility, such as if "prior state case law has consistently rejected a particular constitutional claim." *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006). However, futility does not constitute cause if a claim is merely

10

"unacceptable" to a particular court at a particular time. *Id.* (quoting *Bousley*, 523 U.S. at 623, and *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982)). "The 'prejudice' requirement is met by establishing actual prejudice resulting from the errors of which Petitioner complains." *Gutierrez v. Smith*, 702 F.3d 103, 112 (2d Cir. 2012) (quoting *Frady*, 456 U.S. at 168 and *Murray v. Carrier*, 477 U.S. 478, 494 (1986)) (internal citations and quotations omitted).

As discussed above, if a petitioner cannot demonstrate cause and actual prejudice, he must establish "actual innocence." *Thorn*, 659 F.3d at 231. To establish actual innocence, a petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 289, 327-28 (1995)). In this context, actual innocence means factual innocence, not legal insufficiency. *Id.* at 623-24 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

## ARGUMENT

The Petition raises five grounds for habeas relief, all of which are meritless. Petitioner failed to raise four of the five grounds in his direct appeal and they are thus procedurally defaulted. The remaining ground—Petitioner's challenge to the Court's use of BVAL as part of its loss and restitution calculations—has already been rejected by the Second Circuit, and for good reason. All told, Petitioner does not demonstrate any entitlement to relief here.

### I.    Petitioner's Defaulted *Brady* Claim Fails

Petitioner asserts as his first ground for relief that the Government violated its obligations under *Brady*, by "failing to disclose that Bloomberg's BVAL tool . . . was under SEC investigation and was later fined $5 million for valuation errors." Petition at 17. Petitioner's argument appears to be based on a settlement the SEC reached with Bloomberg due to Bloomberg's failure to disclose that its "Evaluator Input Tool" (EIT)— a tool that can be used in BVAL—could "in certain

11

circumstances," result in a valuation based on a "single data point" when pricing "fixed income securities."  Order, In the Matter of Bloomberg Finance L.P. ("SEC Release"), Securities Act Release No. 11150, 2023 WL 369464, at *3 (Jan. 23, 2023).  Petitioner waived this *Brady* claim by failing to raise it on direct appeal, and regardless as this Court has already concluded, any *Brady* argument predicated on the 2023 SEC settlement with Bloomberg is "riddled with problems." *Velissaris*, 2023 WL 2875487, at *12.

As a threshold matter, Petitioner procedurally defaulted any *Brady* claim based on the SEC investigation into Bloomberg by failing to raise that claim on direct review.  As mentioned, Petitioner appealed (1) the Court's decision not to permit him to withdraw his guilty plea; (2) the Court's loss calculation; and (3) the Court's restitution order.  By contrast, while Petitioner mentioned the SEC settlement with Bloomberg in the facts section of his opening appellate brief, *see* Case No. 23-6953, No. 10 at 23, he did not raise a *Brady* claim based on that settlement.  Nor can Petitioner demonstrate cause for his failure to raise the *Brady* claim on appeal.  Petitioner raised the *Brady* claim to this Court as part of his motion to withdraw his plea filed months before his appeal.  Far from having been "impeded by some objective factor" from raising the *Brady* claim, *McCleskey*, 499 U.S. at 468, Petitioner simply dropped an issue he was evidently aware of on appeal.

In any event, Petitioner cannot show prejudice from his failure to raise the *Brady* claim on appeal for the same reasons that the claim fails on the merits.  First, Petitioner waived the *Brady* claim in his plea agreement.  Plea Agreement at 5.  Second, Petitioner has failed to point to any evidence indicating that this supposedly exculpatory information was in the prosecution team's possession yet was not disclosed. *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (explaining that the *Brady* obligation extends only to evidence "that is known to the prosecutor").

Indeed, Petitioner offers no indication whatsoever that the Prosecution team had evidence of the SEC's investigation regarding the tool.  And there "is no duty for a prosecutor to search all of government for *Brady* material; such an obligation would be 'an unworkable encumbrance on the system of justice.'" *United States v. Velissaris*, 2022 WL 2392360, at *1 (S.D.N.Y. July 3, 2022) (quoting *United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022)).  As he has with respect to prior motions to this Court regarding the SEC settlement with Bloomberg, Petitioner "presents no argument now as to why information that the SEC had in a separate investigation of a different company should be imputed to the Government in this case." *Velissaris*, 2023 WL 2875487, at *12.

Second*,* as this Court has already concluded, the information Petitioner highlights regarding the SEC settlement is not exculpatory. The settlement with Bloomberg "concerned Bloomberg's disclosures about the methodology used by EIT, not about the tool's accuracy." *Id.* at *12.  Indeed, the Settlement states the opposite, that "there is no evidence that BVAL's prices [as valued through EIT] were erroneous." SEC Release, at *3.  Moreover, the EIT tool worked to value fixed income securities, but the positions at issue in this prosecution were not fixed income securities and there is no evidence that EIT was used to price them. *Velissaris*, 2023 WL 2875487, at *12.  Finally, any purported infirmity with BVAL would not have been material to Petitioner's defense.  Whether BVAL overall was a good tool or not, it was the defendant who chose it, told investors he would use it as an independent valuation tool, and then failed to do so. *See id.* ("[E]ven if Velissaris had testified at trial that he considered the Bloomberg tools inadequate or flawed, he would have been confronted with the fact that they were the tools on which he told investors to rely.").

13

## II.     Petitioner's Defaulted Due Process Claim Fails

Petitioner's second ground for relief, charitably interpreted, appears to allege a due process violation based on the Government's supposed reliance on "illegally edited documents" provided to the SEC by Infinity Q Chief Operating Officer ("COO") Scott Lindell.  *See* Petition at 18-19. Petitioner has also procedurally defaulted this ground, and it is meritless.

First, yet again Petitioner raises as a ground for habeas relief an issue he did not raise on direct appeal, and he does not even gesture at establishing cause or prejudice.  That alone dooms his due process claim.  *Barnett v. United States*, 870 F. Supp. 1197, 1202 (S.D.N.Y. 1994) ("[A] petitioner who fails to raise a claim on direct appeal cannot raise that claim on a § 2255 motion unless he can establish both cause for the procedural default and actual prejudice resulting therefrom.").

Second, on the merits, Petitioner fails to provide any evidence whatsoever that documents were "illegally edited" by Lindell, let alone that such documents were relied on by the prosecution during plea negotiations to the extent that it could have qualified as a due process violation. Petitioner asserts, without any evidentiary basis, that the prosecution "relied heavily on documents and data originating from the SEC's Infinity Q investigation in which COO Scott Lindell was alleged to have illegally edited documents before production."  Petition at 18.  Petitioner does not explain which documents were supposedly edited what those edits were, or in what way that editing rendered the documents false.   While "the knowing use by the Government of false evidence . . . constitutes the denial of due process," *Silverman v. United States*, 556 F.2d 655, 658 (2d Cir. 1977), Petitioner offers no evidence that (i) Lindell illegally edited document before turning them over to the SEC; (ii) that the prosecution team relied on those documents; or (iii) that the prosecution knew such documents had been edited. *See id.* (rejecting due process claim based

14

on supposed Government use of false testimony where "there is not a shred of evidence that the Government had . . . a lead that showed that [the witness] had made the false entries in the minute book," even though "the prosecutor had his suspicions"). "[E]ven construed liberally, his motion is, on its face, palpably incredible and does not refer to any basis in law or fact which would entitle him to relief under § 2255." *Davis v. United States*, 2022 WL 445846, at *2 (S.D.N.Y. Feb. 14, 2022).

Even if Petitioner's allegations of evidence tampering could be credited—and they cannot—infirmities in the SEC's record would not be material to this criminal prosecution. As the Government has previously informed the Court, its case relied "primarily on records it obtained and analysis it performed *itself*," not evidence from the SEC. *Velissaris*, 2022 WL 2392360, at *3 (emphasis added). "Indeed, the USAO did not obtain the SEC's valuation analysis until months after it filed a 33-page indictment describing Velissaris's alleged conduct in considerable detail." *Id.* Petitioner's vague accusations of evidence tampering in no way undercut the knowing and voluntary nature of his plea and certainly do not rise to the level of a due process violation that could vacate his conviction.

## III.    Petitioner's Collateral Attack on His Sentence and Restitution Fails

Petitioner's third ground for relief appears to challenge the Court's admission of expert testimony related to the Government's calculation of loss amount and restitution. Petitioner argues that BVAL is not a sound methodology and thus the Court's "base loss and restitution calculations" were built on "structurally unreliable data," violating Rule of Evidence 703 and depriving him of "a fair, reliable proceeding." Petition at 20. The Second Circuit properly rejected Petitioner's challenge to his sentence and restitution based on a similar attack on the BVAL methodology, and in any event this ground does not provide an appropriate basis for habeas relief.

15

As a preliminary matter, Petitioner cannot now challenge either his sentence or restitution via Section 2255. In the Plea Agreement, Petitioner stipulated to an advisory Guidelines range of 235 to 240 months, which was arrived at in part based on a loss amount of between $65 million and $150 million. As the Second Circuit has explained, "during his guilty plea colloquy, Velissaris waived his right to appeal any prison sentence to the extent it was within or below" the stipulated Guidelines range. *Velissaris*, 2024 WL 4502001, at *3. "Because the district court ultimately imposed a prison term of 180 months, and because Velissaris raises no basis for invalidating the waiver" the Second Circuit "dismiss[ed] his appeal with respect to the calculation of loss as it pertains to the Guidelines." *Id.* (citing *United States v. Burden*, 860 F.3d 45, 51 (2d Cir. 2017)). So too here. Because Velissaris gave up his "right to appeal or challenge or litigate [his] sentence" he cannot challenge that sentence here. *See* Dkt. 72 (Sentencing Hearing Tr.) at 12:13-17. As to restitution, "§ 2255 does not authorize district courts to hear collateral challenges to the restitution parts of criminal sentences." *Rutigliano*, 887 F.3d at 101; *see also Kaminski v. United States*, 339 F.3d 84, 87 (2d Cir. 2003) ("[W]e agree with the other circuits that have held that § 2255 may not be used to bring collateral challenges addressed solely to noncustodial punishments like the one at issue here."). In sum, Petitioner waived any right to appeal his sentence, and in turn his offense level calculation, while restitution cannot be challenged through the habeas mechanism.

Even if permissible, any challenge to the loss calculation or restitution amount would fail because there was nothing inherently unreliable in the use of the BVAL method to calculate restitution or loss amount, and any error would certainly not rise to the level of a constitutional violation warranting habeas relief. A habeas petitioner claiming evidentiary error in any context must show that the error rose to a due process violation, meaning that the error was so "pervasive

16

as to have denied him a fundamentally fair trial." *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). That was not the case here.

Indeed, as the Second Circuit has confirmed, the Court made no error regarding loss calculation or restitution and certainly not one that deprived Petitioner of due process.  The Court's restitution calculation was derived from: (1) the loss to those who held their positions in the fund resulting from overpayments from the fund to shareholders who sold their positions at the inflated rates, and (2) excess management fees to Infinity Q.  *Velissaris*, 2024 WL 4502001, at *4.  The Court determined that the excess payouts caused around $99.4 million in loss resulting from Petitioner's manipulation of fund asset values. *Id.*  at *4.  Of this amount, Petitioner appears to contest only the $54 million attributable to revaluing a portion of Infinity Q's securities using BVAL. *Id.*

Petitioner has not offered any basis to impugn the accuracy of BVAL and certainly not one that would cast doubt on its use in one portion of the Court's restitution calculation.  Most of Petitioner's assault on BVAL is based on his own say-so. *See* Dkt. 149-1 (Velissaris Dec.) ¶ 11 (declaring, without citation, that BVAL "provided extremely inaccurate valuations during periods of medium and high market volatility.")  Petitioner also points to the SEC's 2023 settlement with Bloomberg regarding the EIT tool, which as explained, has no bearing on BVAL's accuracy in this case. *See* pp. 12-13, *supra.*  As the Second Circuit has held in rejecting this precise argument:

> BVAL was the pricing device that Velissaris told investors he would use when valuing Infinity Q's derivative positions and which he surreptitiously changed to alter those valuations—and it was those increased valuations that caused Infinity Q to extract higher fee payments. Thus, revaluing Infinity Q's securities as investors had expected—that is, using BVAL without Velissaris's alterations—was a reasonable, albeit imperfect, method of approximating the losses caused by the defendant's fraud.

*Velissaris*, 2024 WL 4502001, at *4. Yet again, having chosen BVAL as the valuation he would market to investors, Petitioner cannot now claim it has no relevance or reliability in this case.

**IV.  Petitioner's Defaulted Challenge to the Court's Pre-Trial Evidentiary Determination Fails**

As his fourth ground for relief Petitioner asserts that the Court violated his Fifth Amendment right not to testify at trial when it "effectively conditioned" his "ability to present a defense expert witness on valuation on Movant himself taking the stand," which forced Petitioner to choose between "exercising his Fifth Amendment right," and "presenting critical expert testimony on the flaws in Bloomberg's tools." Petition at 20. Petitioner cannot challenge through a habeas petition, for the first time no less, a pre-trial evidentiary decision in a case in which he pled guilty before trial. Regardless, Petitioner offers no basis to conclude that the Court infringed on his Fifth Amendment rights.

First, yet again Petitioner raises on habeas review an argument he failed to raise in his direct appeal and he does not attempt to establish cause or prejudice. Nor could he. Petitioner was well aware of this evidentiary issue when the Court decided it at the pre-trial conference and there was no impediment to his raising it on appeal. Any such appeal would have been successful, as Petitioner's plea waived any ability he might have to challenge a pretrial evidentiary ruling. *See Bartels*, 175 F.3d at 1008 (defendant's claim of error in district court's pretrial rulings was not reviewable because he did not, upon pleading guilty, reserve in writing the right to appeal such determinations); *United States v. Contreras*, 110 F. App'x 153, 154 (2d Cir. 2004) ("It is well settled that a defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings.").

Even if it were somehow reviewable on the merits—and it is not—Petitioner's evidentiary challenge relating to the Court's pretrial determinations regarding the admissibility of expert

testimony is meritless. "An erroneous evidentiary ruling could rise to the level of a constitutional claim cognizable on a habeas petition," only "if it were shown that the error so infected the proceedings as to have rendered a petitioner's trial fundamentally unfair." *Alvarez v. Scully*, 833 F. Supp. 1000, 1005 (S.D.N.Y. 1993). That is far from the case here. Before the scheduled trial in this case, Petitioner proffered Dr. Atanu Saha as an expert witness, who intended to opine at trial that changing BVAL parameters was a "practical way" for Infinity Q to "address the undervaluation problem" inherent in BVAL's modeling programs, which, in his view, systematically undervalued variance swaps. *Velissaris*, 2023 WL 2875487, at *4. The Government moved to preclude this testimony on the ground that it was unhelpful to the jury, given that, again, whether BVAL was accurate or not was irrelevant because Infinity Q chose to use BVAL and market that use to investors, while also representing that it made no substantive changes to the BVAL valuations. *Id*. The Court largely granted the motion to preclude, explaining that:

> Reading the defendant's submission [including Dr. Saha's report and the briefing on the motion], it appeared that the defense in this case is not that the valuations were [not] manipulated in the way that the government is going to try to show through witnesses, but that there was a good reason for the defendant to do that; and that he did not intend to engage in fraud; that his personal intent was to try to capture more accurately the valuation of the particular security at that moment in time. So that, of course, is not something Dr. Saha can address, that is, the defendant's intent. And if the defendant testifies, it's conceivable that some part of Dr. Saha's testimony may become more relevant than otherwise.

*Id.*, at *6. Petitioner is thus wrong to suggest that the Court "conditioned" his ability to "present a defense expert witness on valuation on [Petitioner] himself taking the stand." Petition at 20. The Court reasonably determined that any report impugning the accuracy of Bloomberg would confuse the jury, unless Petitioner offered some sort of evidence that he did not intend to defraud investors but instead manipulated BVAL in order to provide a more accurate valuation. Otherwise, any

19

testimony about the accuracy of BVAL would be irrelevant.  The Court's determination did not constitute an abuse of discretion and certainly did not render Petitioner's criminal proceedings "fundamentally unfair."

### V.      Petitioner's Defaulted Ineffective Assistance Claim Fails

As his fifth and final ground for relief, Petitioner asserts that he received constitutionally ineffective assistance of counsel because one of his attorneys had an undisclosed conflict of interest.  Petition at 21.  According to Petitioner, a member of his attorney team was pursuing employment at the CFTC while representing him in this criminal matter, and this "personal interest" in securing employment, prevented the attorney from "zealously" challenging the "regulatory narrative" in his case and caused him to pressure Petitioner into accepting a plea.  *Id.* Petitioner waived this argument by not raising it on direct appeal.  In any event, Petitioner does not allege a plausible conflict let alone one that could have prejudiced the outcome of his case.

Petitioner failed to assert any Sixth Amendment claim on appeal, despite apparently knowing about the alleged conflict of interest "weeks before sentencing."  Petition at 21.  *See Campino v. United States*, 968 F.2d 187, 190 (2d Cir. 1992) ("[A] procedural default of even a constitutional issue will bar review under § 2255, unless the defendant can meet the cause and prejudice test.").  Having made the strategic decision not to raise the issue on appeal, Petitioner cannot collaterally attack his counsel's effectiveness on habeas review.

Moreover, even if this claim were reviewable, Petitioner cannot establish any Sixth Amendment violation.  To prove the Sixth Amendment right to effective counsel "has been violated, a defendant must show (1) the attorney's representation fell below an objective standard of reasonableness," such that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment" and (2) the defendant suffered actual prejudice, that is, that

20

"there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020) (citation omitted) (citing *Strickland v. Washington*, 466 U.S. 668 (1984) (internal quotation marks omitted)); *Strickland*, 466 U.S. at 687. A defendant claiming ineffective assistance of counsel on the basis of a conflict of interest must demonstrate that the actual or potential "conflict 'affected counsel's performance' [and that] at least some plausible defense strategy was forgone as a consequence of [counsel]'s conflict of interest." *Amato v. United States*, 763 F. App'x 21, 25 (2d Cir. 2019) (quoting *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir. 2002)). Moreover, "[t]he plausibility of an alternative strategy must rise above mere speculation." *Id.* (quoting *Eisemann v. Herbert*, 401 F.3d 102, 108 (2d Cir. 2005)).

Petitioner has failed to allege a plausible conflict of interest or any potential prejudice resulting from the supposed conflict. Petitioner bears the burden of proving the existence of a conflict by a preponderance, and that burden "cannot be met by speculative assertions of bias or prejudice." *Triana v. United States*, 205 F.3d 36, 41 (2d Cir. 2000). Petitioner was ably represented by a team of lawyers from Arnold & Porter, LLP. The fact that one member of that team may have at one point applied for a position at the CFTC, which is not the entity that prosecuted this case, in no way calls the effectiveness of that team into question. *Cf. United States v. Ward*, 85 F. App'x 246, 248 (2d Cir. 2004) (fact that one member of defense team was "in the early stages of being considered for an Assistant U.S. Attorney position" did not rise to the level of a Sixth Amendment violation where defendant waived conflict).

Nor has Petitioner established that counsel forewent any plausible alternative strategy due to the supposed conflict. Instead, Petitioner argues only that the conflict caused one of his attorneys to coerce him to plead guilty. But this Court has already considered and rejected Petitioner's argument that he was coerced by attorneys into accepting a plea. In denying

21

Petitioner's motion to withdraw his guilty plea, the Court concluded that Petitioner's plea was "knowing and voluntary" and that there was "no indication from this record that defense counsel was pressuring Velissaris to plead guilty." *Velissaris*, 2023 WL 2875487, at \*14 (S.D.N.Y. Apr. 10, 2023). To the contrary, Petitioner's "counsel was fully prepared to proceed to trial." *Id.* Petitioner, as the Court has observed, is a sophisticated person who made the "rational" decision to plead guilty in the face of overwhelming evidence. *Id.* And he "assured the Court at the plea allocution that he was satisfied with the representation that his attorneys had given him." *Id.*

Finally, Petitioner's comprehensive admissions during the plea allocution defeat any ineffective assistance claim premised on an actual or potential conflict. Because petitioner "unambiguously admitted that he had committed the crimes charged at his plea allocution," he would not be able to show that even an *actual* "conflict of interest adversely affected his lawyer's performance." *Rodriguez v. Fischer*, 2002 WL 1492118, at \*3 (S.D.N.Y. July 11, 2002).

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion in its entirety.

Dated: New York, New York
March 16, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By: */s/ Leslie B. Arffa*
Leslie B. Arffa
Assistant United States Attorney
(212) 637-6522
Leslie.arffa@usdoj.gov

22